## In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-1693

UNITED PHOSPHORUS, LTD., an Indian corporation;
SHROFF'S UNITED CHEMICALS, LTD., an Indian
corporation; and J.C. MILLER & ASSOCIATES,
INCORPORATED, an Illinois corporation,

*Plaintiffs-Appellants,*

*v.*

ANGUS CHEMICAL COMPANY, a Delaware corporation;
ANGUS CHEMIE GmbH, a German corporation;
the ESTATE of FREEMAN HUGHES through its
representative Yvonne Hughes; OLLIE W. CHANDLER;
LOWELL PALS; GARY W. GRANZOW; D.B. GUPTA; and
LUPIN LABORATORIES, LTD., an Indian corporation,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94 C 2078—**Ian H. Levin**, *Magistrate Judge.*

ARGUED APRIL 4, 2002
REARGUED EN BANC NOVEMBER 6, 2002
DECIDED MARCH 10, 2003*

---

* Chief Judge Flaum and Circuit Judge Williams did not
participate in the consideration or decision of this case.

Before POSNER, COFFEY, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Today, for the first time in this court, we encounter the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a (FTAIA), a 1982 amendment to the Sherman Act, which affects its reach in foreign commerce. The primary issue involves whether the relevant provision of FTAIA is jurisdictional or whether it states an additional element of a Sherman Act claim. This in turn affects how a court deals with it and, in this case, what the outcome will be.

Plaintiffs United Phosphorus and Shroff's United Chemicals are chemical manufacturers based in India. J.C. Miller & Associates is an American firm, which was involved in a joint venture with the Indian plaintiffs. The defendants are Angus Chemical and its officers, Angus Chemie GmbH, and Lupin Laboratories—American companies or subsidiaries of American companies, which we will refer to collectively as Angus. The complaint alleges that Angus attempted to monopolize, did monopolize, and conspired to monopolize the market for certain chemicals, in violation of § 2 of the Sherman Act.

The issue of the court's subject matter jurisdiction was first raised soon after the case was filed in 1994. Angus' Rule 12(b)(1) motion was denied. Then, after considerable discovery (24 depositions and 8,000 pages of exhibits), Angus filed renewed motions to dismiss for lack of subject matter jurisdiction and for summary judgment in 2000. Angus contended that the court lacked subject matter jurisdiction under FTAIA, which, as relevant here, limits application of the Sherman Act to conduct with a "direct, substantial, and reasonably foreseeable effect" on domestic commerce. After a thorough analysis of the facts, Magistrate Judge Ian H. Levin, sitting by consent, agreed with Angus and granted its motion to dismiss. *United Phospho-*

*rus, Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003 (N.D. Ill. 2001).

Briefly, to the facts. In their original 1994 complaint, the plaintiffs alleged that India had the "greatest incidence of tuberculosis in the world." That allegation is consistent with a report from the Centers for Disease Control, dated March 22, 2002, which says that every year approximately 2 million people in India develop tuberculosis, accounting for 25 percent of the world's new cases. The parties tell us that "Ethambutol" is a primary pharmaceutical for the treatment of the disease. The chemicals involved in its production are the subject of this lawsuit.

2-Amino-1 Butanol (AB)is the key ingredient of Ethambutol, and 1-Nitro-Propane (1-NP) is the raw material from which AB is made. To make Ethambutol, defendant Lupin uses AB, which it buys from defendant Chemie, currently the world's only manufacturer of AB. Chemie is a German subsidiary, wholly owned by defendant Angus. The AB is manufactured in Germany. Angus manufactures 1-NP at a plant in Louisiana and is the world's only manufacturer of 1-NP.

This lawsuit stems from prior trade-secret litigation involving several of the parties. In the early 1990's, the Indian plaintiffs decided to acquire the technology for making AB and 1-NP. They went to Dr. John Miller (owner of J.C. Miller & Associates), who also had been the vice-president of research and development at Angus and supervised Angus' efforts to improve its AB processes. When Angus learned what was going on, it sued Miller and the Indian entities (who are the plaintiffs here) in an Illinois state court, seeking to enjoin Miller from misappropriating its trade secrets. Two years later, when Angus was faced with a discovery order which would have required it to disclose the details of the technology, Angus voluntarily dismissed the lawsuit.

The defendants in that case then filed this suit. As plaintiffs here, they claim that but for the Illinois action they would have sold AB for profit. They accuse Angus et al. of using anticompetitive means—the lawsuit—to thwart their plans.

As we said, the case was dismissed for lack of subject matter jurisdiction under FTAIA, which amends the Sherman Act, stating:

> This Act shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
>
> > (1) such conduct has a direct, substantial, and reasonably foreseeable effect—
> >
> > > (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
> > >
> > > (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
> >
> > (2) such effect gives rise to a claim under the provisions of this Act other than this section.
>
> If this Act applies to such conduct only because of the operation of paragraph (1)(B), then this Act shall apply to such conduct only for injury to export business in the United States.

What is relevant here is that the conduct must have "a direct, substantial, and reasonably foreseeable effect" on trade or commerce within the United States, rather than just on foreign commerce.

If the requirement for a substantial effect on commerce in the United States goes to the court's subject matter jurisdiction, the case is analyzed under Federal Rule of Civil Procedure 12(b)(1), which provides for dismissal of

an action for lack of subject matter jurisdiction. Subject matter jurisdiction is, as we know, an issue that should be resolved early but must be considered at any stage of the litigation. If subject matter jurisdiction is not evident on the face of the complaint, the motion to dismiss pursuant to Rule 12(b)(1) would be analyzed as any other motion to dismiss, by assuming for purposes of the motion that the allegations in the complaint are true. However, as here, if the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction, the movant may use affidavits and other material to support the motion. The burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884 (3d Cir. 1977). And the court is free to weigh the evidence to determine whether jurisdiction has been established. *Capitol Leasing Co. v. FDIC*, 999 F.2d 188 (7th Cir. 1993); *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922 (2d Cir. 1998); *Carpet Group Int'l v. Oriental Rug Importers Ass'n*, 227 F.3d 62 (3rd Cir. 2000). Factual findings rendered during this process are reviewed for clear error. *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215 (7th Cir. 1995); *Kruman v. Christie's Int'l PLC*, 284 F.3d 384 (2d Cir. 2002).

On the other hand, if the requirement for a substantial effect on U.S. commerce is an element of the claim, then the motion would be properly treated under Rule 56 summary judgment standards. Summary judgment on the merits can be granted if, construing the facts against the moving party, there is no genuine issue of material fact and that party is entitled to judgment as a matter of law. In short, at this stage of the litigation—that is, when the court is considering a motion—the analysis differs if the issue is one of jurisdiction or an issue on the merits. We think it is fair to say that in this case the procedure employed will dictate the result. The appellants have made little effort to demonstrate that the district court's findings of fact are clearly erroneous. They claim,

however, that what we have here should be viewed as a motion for summary judgment on the merits. Under the summary judgment standard with the facts construed in their favor, they contend that the defendants' motion should have been denied. The defendants, of course, contend that they should win under either standard, a proposition on which we need pass no judgment.

Over the years, the difficult issue of limiting the extraterritorial reach of the United States laws in international trade and international relations has received a good deal of attention. Despite the fact that, using language borrowed from the Foreign Commerce Clause of the Constitution, the Sherman Act itself prohibits agreements restraining "trade or commerce . . . with foreign nations," there has long been concern about overreaching under our antitrust laws. As far back as *American Banana Co. v. United Fruit Co.*, 213 U.S. 347 (1909), Justice Holmes said that the almost universal rule is that the "character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done." *American Banana*'s strict territorial test was moderated, if not rejected, in *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945). Judge Learned Hand was writing for the Court of Appeals for the Second Circuit, sitting pursuant to 15 U.S.C. § 29, which at the time authorized the designation of a court of appeals as a court of last resort for certain antitrust cases. The issue was whether Congress intended to impose liability for conduct outside the United States and whether the Constitution permitted it to do so. The court recognized that it should not read the words of Congress "without regard to the limitations customarily observed by nations upon the exercise of their powers." At 443. Creating what became known as the "effects test," the court concluded that the Sherman Act must be limited to acts which were "intended to affect [U.S.] imports and did affect them."

Rejected was the notion that Congress intended "to punish all whom its courts can catch, for conduct which has no consequences within the United States." At 443. The Supreme Court subsequently approved the effects test. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962).

Then FTAIA was enacted in 1982. There is some debate over the extent to which the Act simply codifies the "general understanding of when American antitrust law should be concerned about restraints abroad . . . ." *See* 1A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 272 (2d ed. 2000). In *Hartford Fire Insurance v. California*, 509 U.S. 764 (1993), the Court declined to decide whether FTAIA was a codification of prior law, but concluded that an agreement among foreign reinsurers and domestic insurers, under which the foreign reinsurers would refuse to cover certain American domestic insurance policies, met the effects test.

It is in *Hartford*, however, that Justice Scalia, in dissent, sets out the view that FTAIA does not go to subject matter jurisdiction at all. He perceived two distinct questions: whether the district court had jurisdiction, and whether the Sherman Act reaches the extraterritorial conduct alleged. His conclusion was that the district court had subject-matter jurisdiction, simply because the Sherman Act claim was not frivolous and 28 U.S.C. § 1331 gives the district court jurisdiction over cases "arising under" federal statutes. The second question, he said, "has nothing to do with the jurisdiction of the courts. It is a question of substantive law turning on regulatory power over the challenged conduct." At 813. If the plaintiff were to fail to prevail on this question, the case would be dismissed not for lack of subject matter jurisdiction, but rather on the merits because the plaintiff had failed to state a cause of action. Justice Scalia explained that what is involved is "legislative jurisdiction"

or "jurisdiction to prescribe," which refers to the authority of Congress to enact the law in the first place. The Sherman Act, tracking, as it does, the Commerce Clause, is well within legislative jurisdiction. Nevertheless, principles of international comity dictate how a statute will be interpreted: "Though it clearly has constitutional authority to do so, Congress is generally presumed not to have exceeded those customary international-law limits on jurisdiction to prescribe." At 815.

The majority in *Hartford* carries out the debate with Justice Scalia in footnotes. As to Justice Scalia's contention that what is involved in the case is prescriptive, as opposed to subject-matter jurisdiction, Justice Souter says that the parties "for good reason" do not question prescriptive jurisdiction. He then quotes commentators who say that the Sherman Act is a "prime exampl[e] of the simultaneous exercise of prescriptive jurisdiction and grant of subject matter jurisdiction." At 796 n.22. In explaining the role of comity, Justice Souter says that comity comes into play "if at all, only after a court has determined that the acts complained of are subject to Sherman Act jurisdiction." At 797 n.24. Principles of international comity did not prevent the exercise of jurisdiction in that case.

One could argue that in *Hartford* it is not entirely clear what the phrase "Sherman Act jurisdiction" means. After all, "Jurisdiction is a word of many, too many, meanings." *United States v. Vanness*, 85 F.3d 661, 663, n.2 (D.C. Cir. 1996), *quoted in Steel Co. v. Citizens for Better Environment*, 523 U.S. 83 (1998). But it seems reasonable to conclude, especially in light of the footnotes, that what the *Hartford* Court refers to is the court's subject-matter jurisdiction for Sherman Act claims.

That reading receives some support in domestic Sherman Act cases, which do not implicate FTAIA, but may shed some light by analogy. *McLain v. Real Estate Board of*

*New Orleans, Inc.*, 444 U.S. 232 (1980), was a private antitrust action, alleging that real estate brokers in New Orleans engaged in a price-fixing conspiracy. The issue before the Court was whether the Sherman Act extended to such a conspiracy. The procedural history shows that the district court had dismissed the case under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The Court of Appeals for the Fifth Circuit said that the appropriate designation of the dismissal was for lack of subject-matter jurisdiction under Rule 12(b)(1) but, nevertheless, affirmed. The Supreme Court disagreed with the court of appeals on what is required for jurisdiction to exist but implicitly agreed that the case presented an issue of jurisdiction. The Court said:

> To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity.

At 242. The Court also said that despite "the breadth of Sherman Act prohibitions, jurisdiction may not be invoked under that statute unless the relevant aspect of interstate commerce is identified . . . ." At 242.

More recently, in *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322 (1991), the Court considered

> whether the interstate commerce requirement of antitrust *jurisdiction* is satisfied by allegations that petitioners conspired to exclude respondent, a duly licensed and practicing physician and surgeon, from the market for ophthalmological services in Los Angeles because he refused to follow an unnecessarily costly surgical procedure. [Emphasis added.]

The Court again had trouble agreeing on the precise answer to that question, as its 5-4 split shows, but said that the conspiracy at issue "has a sufficient nexus

with interstate commerce to support federal jurisdiction." At 333.

The Sherman Act and its FTAIA amendments are not the only statutes which present the dilemma regarding whether a statutory requirement is an element of a claim or a matter of subject-matter jurisdiction. In *Gwaltney v. Chesapeake Bay Foundation*, 484 U.S. 49 (1987), the Court determined that for subject-matter jurisdiction to exist under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, a plaintiff need only make a good-faith *allegation* of a continuous or intermittent violation of the Act. Justice Scalia dissented, this time not because all the subject-matter jurisdiction a court needs is provided under §1331, but rather because "subject-matter jurisdiction can be called into question *either* by challenging the sufficiency of the allegation *or* by challenging the accuracy of the jurisdictional facts alleged." At 68 [emphasis in the original]. A little over 10 years later, in *Steel Company*, the Court considered the Emergency Planning and Community Right-To-Know Act (EPCRA), 42 U.S.C. § 11046(a)(1). Justice Scalia, writing for the Court, and Justice Stevens, joined in part by Justices Souter and Ginsburg concurring in the judgment, debated, among other things, whether a provision of EPCRA was jurisdictional or an element of the claim. Looking to *Gwaltney*, Justice Stevens thought it was jurisdictional; Justice Scalia dismissed *Gwaltney* as a "drive by" jurisdictional ruling. In the Title VII context we have determined that the requirement that the definition of employer as "a person . . . who has fifteen or more employees" was an element of the claim, not a matter of the subject matter jurisdiction of the court. The plaintiff had presented "a non-frivolous claim under federal law; no more is necessary for subject-matter jurisdiction." *Sharpe v. Jefferson Distrib. Co.*, 148 F.3d 676, 677 (7th Cir. 1998). The jurisdiction-versus-element-of-the-claim debate seems alive and well.

Turning back to FTAIA, we note that commentators tend to discuss FTAIA in terms of jurisdiction. *See*, *e.g.*, P. Areeda & H. Hovenkamp, ¶ 273; Herbert Hovenkamp, *Federal Antitrust Policy*, § 21.2 (2d ed.). Referring directly to subject-matter jurisdiction, the *ABA Section of Antitrust Law, Antitrust Law Developments* (5th ed. 2002), at 1121, states that "to establish subject matter jurisdiction under the FTAIA, a plaintiff must also show that 'such effect'—i.e., the direct, substantial, and reasonably foreseeable anticompetitive domestic effect—'gives rise to' a Sherman Act claim." In addition, the Department of Justice and the Federal Trade Commission both consider the statute jurisdictional. Regarding jurisdiction over conduct involving foreign commerce, the guidelines for the agencies state "[T]he jurisdictional limits of the Sherman Act and the FTC Act are delineated in the FTAIA." *Antitrust, Unfairness, Deception Policies and Guidelines*, *reprinted in* 4 Trade Reg. Rep. (CCH) ¶13.107. The ABA explains that with "respect to subject matter jurisdiction, the *International Antitrust Guidelines* state that 'anticompetitive conduct that affects U.S. domestic or foreign commerce may violate the U.S. antitrust laws regardless of where such conduct occurs or the nationality of the parties involved.'" Antitrust Law Developments, at 1120.

As we have said, this is our first foray into FTAIA. We have, however, considered the reach of the Sherman Act into foreign commerce prior to the enactment of FTAIA. In *In re Uranium Antitrust Litigation*, 617 F.2d 1248 (7th Cir. 1980), we considered issues raised by the governments of Australia, Canada, South Africa, and Great Britain as to whether the district court could proceed in a case brought by Westinghouse Electric Corporation alleging antitrust violations against 26 foreign and domestic uranium producers. For our purposes, we need not delve into the weighty issues of that case beyond noting that we said at 1253:

> We view the jurisdictional issue as two-pronged: (1) does subject matter jurisdiction exist; and (2) if so, should it be exercised?

However, we also determined in *United States v. Martin*, 147 F.3d 529 (7th Cir. 1998), a criminal case involving the federal "bombing" statute, 18 U.S.C. § 844(I), that the requirement that the bombing have an effect on interstate commerce is not a matter of the court's jurisdiction over the crime or the defendant, but rather an element of the crime. Relying on *United States v. Lopez*, 514 U.S. 549 (1995), Martin wanted to set aside his guilty plea because, he said, it did not waive jurisdictional defenses, and the requirement for an effect on interstate commerce is jurisdictional. We rejected that claim, saying that although the requirement is often referred to as jurisdictional, it is "simply one of the essential elements of § 844(I)." It is, we said, simply a "shorthand sense that without that nexus, there can be no federal crime . . . ." At 532. As we learned in *Lopez*, the nexus to the Commerce Clause is of considerable importance, as a matter of legislative jurisdiction, when Congress seeks to federalize street crimes—crimes which are otherwise the province of the states. In those instances, it seems to us, the requirement for interstate commerce is a hook on which the crime hangs. Once Congress has made the proper findings that, say, a certain crime implicates interstate commerce in some way, proof of the interstate commerce requirement has, at least traditionally, been rather perfunctory. Criminal statutes of this type are far less than compelling analogies to FTAIA.

We see the purity of an argument that 28 U.S.C. § 1331 provides federal question jurisdiction for cases "arising under the Constitution, laws, or treaties of the United States" so that without more, the federal courts have jurisdiction over Sherman Act claims. It would follow, then, that any requirement for an effect on interstate com-

merce must be an element of the claim. We know, however, that nothing is quite that simple. For instance, a frivolous suit which charges a violation of a federal statute "arises under" federal law. Yet, because the suit is frivolous, subject matter jurisdiction over it is lacking. *Bell v. Hood*, 327 U.S. 678, 682-83 (1946) ( "[A] suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."). *See also Crowley Cutlery Co. v. United States*, 849 F.2d 273 (7th Cir. 1988). On the other hand, it is also true that sometimes a reference to "jurisdiction" in statutes is merely, as we said in *Martin*, a shorthand way of referring to an element of the claim. Such references are a way of referring to that part of a statute which sets out the basis for legislative jurisdiction.

But with reference to FTAIA, the argument that the statute sets out an element of the claim or a basis for legislative jurisdiction has not gained approval. Even after the decision in *Steel Company*, the EPCRA case decided in 1998, courts of appeals continue to treat FTAIA as jurisdictional. Whatever their differences in interpretation of the Act or the effect it has on prior judge-made law, all have treated the issue as one of subject matter jurisdiction. *See Kruman* (review of the district court's dismissal for lack of subject matter jurisdiction under FTAIA); *Den Norske Stats Oljeselskap AS v. Heeremac V.O.F.*, 241 F.3d 420 (5th Cir. 2001), *cert. denied sub nom. Statoil ASA v. HeereMac V.O.F.*, 122 S. Ct. 1059 (2002) (finding that the district court properly dismissed antitrust claim for lack of subject matter jurisdiction under FTAIA); *Carpet Group* (finding that FTAIA did not divest the court of subject matter jurisdiction on the claims presented); *Filetech S.A.* (finding that the dis-

trict court should have looked to the factual matters presented to it regarding whether subject matter jurisdiction existed under FTAIA); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless, P.L.C.*, 148 F.3d 1080 (D.C. Cir. 1998) (stating that a court has subject matter jurisdiction only to the extent that the complaint alleges that the challenged conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce under FTAIA). The latter court has revisited the issue recently to define the "jurisdictional reach of the federal antitrust laws." *Empagran S.A. v. F. Hoffman-Larouche, Ltd.*, 315 F.3d 338 (D.C. Cir. 2003). The argument was whether *Den Norske* or *Kruman* set out the proper view of FTAIA's jurisdictional reach. The court rejected both approaches, saying that its view of the statute falls "somewhere between the views of the Fifth and Second Circuits . . . ." Holding that where the "anticompetitive conduct has the requisite harm on United States commerce, FTAIA permits suits by foreign plaintiffs who are injured solely by that conduct's effect on foreign commerce," the court found that "subject matter jurisdiction is proper" in the case before it. We simply cannot dismiss these cases as "drive-by" jurisdictional rulings.

In *Hartford*, as well, it is not likely that references to jurisdiction are really references to legislative, rather than subject-matter, jurisdiction. Justice Souter made it clear that he disagreed with Justice Scalia's contention that under FTAIA what is at issue is legislative jurisdiction. To reiterate, he said:

> JUSTICE SCALIA believes that what is at issue in this litigation is prescriptive, as opposed to subject-matter, jurisdiction. . . . The parties do not question prescriptive jurisdiction, however, and for good reason: it is well established that Congress has exercised such jurisdiction under the Sherman Act. See

G. Born & D. Westin, International Civil Litigation in United States Courts 542, n.5 (2d ed. 1992) (Sherman Act is a "prime exampl[e] of the simultaneous exercise of prescriptive jurisdiction and grant of subject matter jurisdiction").

So, while it might seem desirable to have no messy extra jurisdictional requirements under some acts of Congress, but not others, that is not how our system necessarily works. There is no question that Congress has the power to limit the jurisdiction of the federal courts. *Lauf v. E.G. Shinner & Co.*, 303 U.S. 323 (1938). Every federal court, other than the Supreme Court, derives its jurisdiction from Congress, which, within constitutional bounds, may withhold or restrict jurisdiction. *Kline v. Burke Constr. Co.*, 260 U.S. 226 (1922). The Court has visited the "jurisdiction stripping" issue recently in the context of the Telecommunications Act of 1996, in which it considered whether federal courts have jurisdiction over a carrier's claim that an order of a state utility commission violated federal law. The Court declined to consider whether 47 U.S.C. § 251(c) conferred jurisdiction, it "at least does not *divest* the district courts of their authority under 28 U.S.C. § 1331 . . . ." *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 122 S. Ct. 1753, 1758 (2002). What is left unspoken is that Congress could divest the courts of jurisdiction if it chose to.

As we have said, the legislative history shows that jurisdiction stripping is what Congress had in mind in enacting FTAIA. The statute was enacted against a backdrop of almost 60 years of precedent which characterized the application of the Sherman Act to the conduct of foreign markets as a matter of subject matter jurisdiction. We must presume that Congress expects statutes to be read to conform with Supreme Court precedent. *Porter v. Nussle*, 534 U.S. 516 (2002). Also as we have said, the courts of appeals had applied the pre-FTAIA effects test as

a limit on subject matter jurisdiction.[1] Nothing in FTAIA hints that Congress intended to dramatically change this approach. In fact, the legislative history indicates otherwise. The House Report says that satisfying FTAIA would be "the predicate for antitrust jurisdiction." It also says, "[t]his bill only establishes the standards necessary for assertion of United States Antitrust jurisdiction. The substantive antitrust issues on the merits of the plaintiffs' claim would remain unchanged." H.R. Rep. No. 97-686 at 11 (1982). Perhaps that is why after FTAIA courts have continued to treat the issue as one of subject matter jurisdiction.

There are good policy reasons for the prevailing approach. The extraterritorial scope of our antitrust laws touches our relations with foreign governments, and so, it seems, it is prudent to tread softly in this area. If FTAIA sets out an issue on the merits, resolution of the issue could be delayed until late in the case, and the potential for a lawsuit to have an effect on foreign markets would exist while the case remained pending. In contrast, if this important issue goes to subject matter jurisdiction, it can be resolved early in the litigation. If missed early on, it can be resolved whenever it becomes clear that the alleged

---

[1] The dissent suggests, incorrectly we think, that our decision will move government prosecutors to avoid the Seventh Circuit when investigating criminal violations of the Sherman Act. We don't think so. But we add that if the dissent is correct, the government will not only have to avoid the Seventh Circuit, but also all the other circuits that say, as we do here, that the requirement of an effect on U.S. commerce relates to subject matter jurisdiction. Finally, we fail to see the harm to Sherman Act criminal prosecutions that concerns the dissent. If the government can't prove to a judge a minimum requirement that activity alleged to be in violation of U.S. criminal law had an effect on U.S. commerce, it shouldn't be bringing a Sherman Act case in the first place.

anticompetitive activity does not have a substantial effect on United States commerce. If the parties do not raise the issue, a judge has an obligation to raise it. Treating the matter as one of subject matter jurisdiction reduces the potential for offending the economic policies of other nations. In short, FTAIA limits the power of the United States courts (and private plaintiffs) from nosing about where they do not belong. And the power of the courts is precisely what subject matter jurisdiction is about. For all of these reasons, we find that the district court properly treated the issue as one of subject matter jurisdiction.

That being the case, we must determine whether the court's findings of fact are clearly erroneous. In its analysis, the court examined thousands of pages of evidentiary materials which formed the basis for its findings of fact. The court found that there was virtually no evidence that the plaintiffs would have made any sales in the United States. They set out to produce a tuberculosis drug for India. Experts say that the main application for AB is to produce Ethambutol, which is primarily used in India. The Lederle division of American Home Products was at the relevant time the only company in the world that had FDA approval to sell Ethambutol in the United States. Lederle imported Ethambutol into the United States from Italy using a product that it buys in India. In fact, it appears that the very small amount of AB sold in the United States was used as an ingredient in a product for making rocket motors, not drugs. 3M used a very small amount for this purpose, purchasing less than 0.4 percent of the world's AB production—or $25,000 in total volume. But 3M never conducted formal bidding for this small purchase and shows no signs of changing its supplier.

Other than saying that "there is ample evidence to support plaintiffs' allegations," plaintiffs do not tell us how the court's findings are clearly erroneous. True, the plaintiffs outline the evidence reflecting their plans to

manufacture the products for sale in the United States. And, in fact, it may be that there was evidence to support that position. But the district court is allowed on this motion to weigh the facts, and when it did, it found that plaintiffs

> had no actual plans to sell AB in this country and that there would have been no significant AB sales opportunities for Plaintiffs in this country even if they had tried to sell AB here. For instance, Miller testified that he "had no conversation with any potential customers for AB in the United States." Miller Dep. 413. Moreover, Shroff testified that he and his "marketing man" spoke with ten to twelve potential AB customers, all of which were located in India. Shroff Dep. 144-45, 161-62.

At 1012. Plaintiffs' own liability expert testified that AB sales in the United States would be "less than substantial." Similar findings were made regarding the other chemicals involved. The plaintiffs do not point out how these findings were clearly erroneous, and our review leads us to conclude that they were not. With the dismissal of the federal claims, the dismissal of pendent state-law claims was also proper. Accordingly, the judgment of the district court is AFFIRMED.

DIANE P. WOOD, *Circuit Judge,* dissenting, with whom Circuit Judges EASTERBROOK, MANION, and ROVNER join. In straightforward language, the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. § 6a, says that the Sherman Act "shall not apply" to conduct involving foreign trade or commerce unless that conduct has a "direct, substantial and reasonably foreseeable effect" on either U.S. domestic commerce, U.S. import commerce, or (for U.S. exporters only) on U.S. export commerce. The question before us today, which not only reaches this court as an issue of first impression, but which has also never been analyzed thoroughly by any other court, is whether these criteria for the statute's "applicability" strip federal district courts of their acknowledged subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over cases that do not meet the test, or if instead they describe an element of the plaintiff's claim. The majority has opted for the former approach, largely because the word "jurisdiction" appears in many prior decisions of lower courts and in certain materials published by the government's antitrust enforcement agencies and the American Bar Association. But neither the majority nor those earlier opinions have distinguished carefully between judicial and legislative jurisdiction—or, to put it differently, between jurisdiction to decide a case and jurisdiction to prescribe a rule of law. The central question now before us is whether the FTAIA affects the former or the latter power. Given the fact that "jurisdiction is a word of many, too many, meanings," *ante* at 8, quoting *United States v. Vanness*, 85F.3d 661, 663 n.2 (D.C. Cir. 1996), which was quoted in *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 90 (1998), it is plain that the analysis cannot stop with the observation that the FTAIA somehow affects "jurisdiction."

In my view, there are at least four compelling reasons why we should not construe the FTAIA's test as one going to the subject matter jurisdiction of the court, and

instead should adopt what I will call an "element" approach: first, the language of the statute supports the position that this is an element of the claim, especially when it is contrasted to true jurisdiction-stripping statutes; second, the "subject matter jurisdiction" characterization is inconsistent with the Supreme Court's decision in *Steel Co.* and with the law of this court; third, the procedural consequences of a "subject matter jurisdiction" reading would have perverse effects, measured against the policies the FTAIA and the federal antitrust laws were designed to further; and finally, to call this "subject matter jurisdiction" fails to take into account the long history of the application of the U.S. antitrust laws to foreign conduct.

## I

Although the majority has set forth the relevant language of the FTAIA, it bears repeating here, both for ease of reference and for emphasis. It reads as follows (and there is equivalent language covering section 5 of the Federal Trade Commission Act):

Sections 1 to 7 of this title [Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial and reasonably foreseeable effect—

A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

B) on export trade or export commerce with foreign nations, of a person engaged in such trade or in commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a.

One will search in vain in this brief passage for any hint that the Congress was attempting to strip federal courts of their competence to hear and decide antitrust cases with a foreign element. In my view, that alone should be enough to tip the balance toward the "element" characterization. To begin with, while one can find examples in Supreme Court decisions of the Court's treatment of statutes with jurisdictional language as non-jurisdictional (*e.g.*, *Steel Co.,* discussed below; *Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 950-51 (1997) (False Claims Act)), there are no examples of the opposite approach—treating something as jurisdictional that is phrased in terms of the scope of application of a statute. Secondly, this court has recognized that jurisdiction-stripping rules must be expressed clearly. In *Czerkies v. U.S. Department of Labor*, 73 F.3d 1435 (7th Cir. 1996) (*en banc*), we held that the door-closing statute prohibiting judicial review of certain federal workers' compensation claims should not be construed to bar review of constitutional claims in the absence of express language to that effect. *Id.* at 1439. The same approach is appropriate for other kinds of jurisdiction-stripping statutes. Naturally, when Congress does speak clearly, as it did in the statute that bars judicial review of certain immigration decisions, see 8 U.S.C. §§ 1252(a)(2)(B) and 1255, the courts do and should recognize that their competence to act has been withdrawn. See *McBrearty v. Perryman*, 212 F.3d 985 (7th Cir. 2000) (dismissing suit attempting to avoid § 1252(a)(2)(B), which provides that "notwithstanding any other provision of law, no court shall have jurisdiction to review . . . any judgment regarding the granting of relief under" section 1255). Language

like that of the FTAIA, stating that a law does not "apply" in certain circumstances, cannot be equated to language stating that the courts do not have fundamental competence to consider defined categories of cases.

## II

The fact that the FTAIA does not contain a clear congressional statement that it is intended to restrict the subject matter jurisdiction of the federal courts (or for that matter even a brief mention of the term "jurisdiction") should be enough to resolve the question before us. If more is needed, then we must consider further how to determine whether a particular law affects the competence of a federal court to entertain the case at all, or if it simply outlines the scope of the statute and permits the court to issue a decision on the merits either upholding or rejecting a claim. Our starting point should be the Supreme Court's decision in *Steel Co., supra,* 523 U.S. 83. In *Steel Co.,* the Supreme Court held that the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 42 U.S.C. § 11046(a)(1), which permitted a private action only if certain prerequisites were satisfied, did not affect the district court's subject matter jurisdiction. 523 U.S. at 89-90. Although the EPCRA actually used the word "jurisdiction" to describe the permitted actions, the Court did not find that fact dispositive. Instead, it reaffirmed the long-standing rule that power to adjudicate a case does not depend on whether in the final analysis the plaintiff has a valid claim. "[T]he district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another." *Id.* at 89 (internal quotations omitted). In the present case, the plaintiffs will have a right

to recover if defendants' activities have the requisite effect on either U.S. domestic or import commerce (and they can prove the remainder of their federal antitrust claim), and they will lose if those effects are lacking.

It is worth noting that the extraterritorial reach of statutes varies widely. Some statutes, such as Title VII of the Civil Rights Act of 1964, have been interpreted by the Supreme Court as having no application at all beyond U.S. borders, even if both the employer and the employee are U.S. citizens. See *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991). Other statutes, such as 18 U.S.C. § 2333, are virtually unlimited in their territorial reach. Section 2333 provides a private right of action for civil damages for any national of the United States injured "by reason of an act of international terrorism" (or the victim's estate) to sue those responsible for the act in a U.S. court for treble damages, no matter where in the world the act occurred, and no matter what the nationality of the perpetrator was. See *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000 (7th Cir. 2002). Still other statutes are like the FTAIA: they define a subset of actions and actors outside the United States whose actions fall within the scope of U.S. law. It is up to Congress to decide how broad or narrow a law it is enacting, and what the plaintiff must prove to be entitled to relief.

That is what Congress did in the FTAIA: it established the "direct, substantial, and reasonably foreseeable" effect on commerce test as an element of the plaintiff's claim. It did not disempower the federal courts from ruling on the merits for a defendant when the plaintiff is unable to make the requisite showing. The majority's suggestion that the Supreme Court held otherwise in *Hartford Fire Ins. v. California*, 509 U.S. 764, 812 (1993) is inaccurate. In fact, the *Hartford Fire* majority thought it unnecessary to address the FTAIA's effect on the case

at all, see *id.* at 797 n.23, and thus it had no need to engage the dissenters on the "element" versus "jurisdiction" point. It is true that Justice Scalia, writing for the four dissenters, observed that "[a] cause of action under our law was asserted here, and the court had power to determine whether it was or was not well founded in law and in fact." *Id.* at 812. Even though this isolated statement was in a dissent and thus not authoritative at the time it was made, the more important point is that the legal principle it reflected was later adopted by a majority of the Court first in *Steel Co.,* and then later in *United States v. Cotton,* 535 U.S. 625 (2002) ("*Bain*'s elastic concept of jurisdiction is not what the term "jurisdiction" means today, *i.e.*, "the courts' statutory or constitutional *power* to adjudicate the case.") (Emphasis in original, quoting from *Steel Co.*). The approach I am advocating is entirely consistent, therefore, with current Supreme Court doctrine.

This court has had occasion to consider the question whether effect-on-commerce elements analogous to those in the FTAIA affect subject matter jurisdiction or the statement of a claim, and we have concluded that they do not. See *United States v. Martin*, 147 F.3d 529 (7th Cir. 1998), cited with approval in *United States v. Rayborn*, 312 F.3d 229, 231 (6th Cir. 2002); *United States v. Carr*, 271 F.3d 172, 178 (4th Cir. 2001); *United States v. Prentiss*, 256 F.3d 971, 982 (10th Cir. 2001); *United States v. Beck*, 250 F.3d 1163, 1165 (8th Cir. 2001); *Alikhani v. United States*, 200 F.3d 732, 734-35 (11th Cir. 2000). While the statute at issue in *Martin* was a criminal law, 18 U.S.C. § 844(i), I agree with the First Circuit that there is no jurisdictional distinction in the Sherman Act between the civil and criminal reach of the statute. See *United States v. Nippon Paper Indus.*, 109 F.3d 1 (1st Cir. 1997). (Indeed, I do not understand the majority to be taking issue with this aspect of the *Nippon Paper* holding.) The

fact that the present case is civil, and *Martin* was criminal, therefore provides no reason not to follow *Martin*'s jurisdictional characterization. Nor do I see any other principled distinction that can be drawn between our analysis in *Martin* and the problem now before us.

### III

Yet another reason why the majority's rule is ill-advised comes from the nature of jurisdictional rules and the consequences of treating something as affecting the subject matter jurisdiction of the court. Rules about subject matter jurisdiction define the allocation of business between the federal and the state courts. The federal courts are courts of limited jurisdiction. Only if Article III of the Constitution confers power on them to hear the particular kind of case or controversy at issue, and if a statute of Congress has implemented that constitutional grant of power, can a case be heard in federal court.

The first point here is that a recognized issue of subject matter jurisdiction must be resolved before any other action is taken on the case. There is an important institutional interest in resolving jurisdictional questions quickly and simply. Congress recognized this in one of its classic jurisdiction-stripping rules: federal appellate courts have no jurisdiction to review district court decisions remanding cases to state court when the district court relies on a reason outlined in 28 U.S.C. § 1447(c). See 28 U.S.C. § 1447(d). Inquiries into whether a case "arises under" federal law, for purposes of § 1331 jurisdiction, can normally be completed by a review of the complaint. Inquiries into diversity jurisdiction are often just as straightforward, even though fact-finding might be necessary in the occasional case in which it is unclear where a person is domiciled, or what amount is in controversy, or which of several corporate facilities should count as the corporation's principal place of business.

The jurisdictional inquiries just described are well-defined and do not normally consume enormous judicial resources. In contrast, an inquiry into whether a particular course of conduct has a "direct, substantial, and reasonably foreseeable effect" on either the domestic commerce of the United States or its import commerce threatens to become a preliminary trial on the merits. Indeed, the record in one famous international antitrust case, *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, should give advocates of the "subject matter jurisdiction" approach serious pause. That case was originally filed in the district court in 1973. In 1974, the district court dismissed for want of "subject matter jurisdiction." The Ninth Circuit reversed in 1976. See 549 F.2d 597 (9th Cir. 1976). Six years of discovery then took place, in which the parties explored the effects of the alleged conspiracy on U.S. commerce. In 1983, the district court again dismissed the action for want of jurisdiction. See 574 F. Supp. 1453 (N.D. Cal. 1983). Up on appeal again to the Ninth Circuit, the case was affirmed, though on somewhat different grounds. 749 F.2d 1378 (9th Cir. 1984). In 1985, the Supreme Court denied certiorari, see 472 U.S. 1032 (1985), with a note indicating that Justices White and Blackmun would have granted review. Thus, at least 12 years after the case was filed, the "jurisdictional" issue was finally resolved. Had it been resolved in the affirmative, there is no telling how many more years would have passed before the litigation was over. This is no way to decide whether the federal courts are competent to hear a case.

The element approach, in contrast, has none of those defects. In some instances, it will be possible to resolve the FTAIA issue on the pleadings or on summary judgment, and appellate review from either kind of decision *de novo*. If the issue is not capable of resolution on summary judgment, that should be a red flag in any event.

Effect on commerce issues will often be closely inter-twined with the merits. Yet if the case reaches the merits, there is no reason why the court cannot resolve the most straightforward issue first. Many antitrust cases founder on the issue of market power, especially when world markets are at issue. But *Steel Co.* made it abundantly clear that courts are not entitled simply to assume juris-diction and resolve an easy merits issue, if true subject matter jurisdiction is at stake.

If something affects the subject matter jurisdiction of the court, there are a number of other consequences which would be undesirable for the FTAIA. First, there is necessarily never a time when the question cannot be raised. As the Supreme Court has repeatedly emphasized, the fundamental competence of the court to act can be challenged at any time, up to and including at the Su-preme Court level. See, *e.g.*, *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379 (1884); Charles Alan Wright, Fed-eral Courts § 7 at 28 (5th ed. 1994). This would offer an irresistible invitation to the losing party in an interna-tional antitrust case to invite the Supreme Court to re-visit the complex question whether there are direct, sub-stantial, and reasonably foreseeable effects on U.S. com-merce, whether or not that objection was preserved be-fore the district court or the court of appeals. Indeed, the court will be required to raise the issue on its own, even if the parties have been content to stipulate to dollar amounts of commerce, destinations of goods, business plans tending to show foreseeability, and other pertinent facts. In many cases, the parties may be willing to stipu-late that the necessary effects on U.S. commerce are present, so that they can get down to the business of resolving their dispute. All that is impossible if we are dealing with subject matter jurisdiction.

Second, characterization affects removal. Recall that the subject matter rules indicate whether the case falls within

the limited jurisdiction of the federal courts. If it does not, then it presumptively can be heard by a state court of general jurisdiction. Although the federal antitrust laws are commonly held to fall within the exclusive jurisdiction of the federal courts, nothing requires Congress to keep things that way. If Congress indeed meant to strip the federal courts of subject matter jurisdiction over foreign commerce antitrust cases, then those cases revert to state courts. No one has suggested that we can also divine from the language of the FTAIA a congressional intent to deny any U.S. forum whatsoever for foreign commerce cases. (Indeed, serious constitutional questions would arise if we were to read the statute as purporting to define the jurisdiction of the state courts, given the degree of sovereignty the states retain under the federal Constitution.) Thus, state courts can and will hear foreign commerce antitrust cases where "direct, substantial, and reasonably foreseeable" effects are missing. Some of those state courts might dismiss on *forum non conveniens* grounds; some might apply their own test for whether a claim is stated and dismiss on the merits; some might keep the case and adjudicate it, creating far greater friction with foreign sovereigns than would result from exclusive federal jurisdiction and an elements-based test. Naturally, if this kind of case is filed in state court, it cannot be removed to federal court, because suits may be removed only if they could have been filed originally in a federal court. See 28 U.S.C. § 1441; *Syngenta Crop Protection, Inc. v. Henson*, 123 S. Ct. 366, 369-70 (2002). Furthermore, even if such a case is physically removed and is lodged in the federal court on an untenable claim of federal jurisdiction, the federal court (after potentially lengthy inquiries into the FTAIA test) will be required to remand it for lack of jurisdiction. See 28 U.S.C. § 1447(c). Such a decision is not a decision on the merits, and it will thus not block further proceedings in the state court.

There are also consequences for appellate review if this is a jurisdictional issue. As already noted, district courts resolve whatever jurisdictional facts are contested in advance of the trial. Appellate review of those fact-findings is deferential. Although the defendants argued that the policies behind the FTAIA—particularly the avoidance of diplomatic tensions with other countries—are better served by the jurisdictional characterization, that assumes that district courts will systematically reject jurisdiction. There is no reason at all to make such an assumption. If district courts find the FTAIA test satisfied, foreign parties will be stuck with deferential appellate review of those facts. This also means that appellate courts will not be free to give plenary consideration to the sensitive issues of international comity that can arise in these cases—issues better resolved at the level of the court of appeals or the Supreme Court than by a solitary district judge. For all these reasons as well, it is preferable to treat the FTAIA as establishing an element of the claim.

The subject matter jurisdiction characterization makes no sense, either from the point of view of the policies being furthered by the FTAIA, or from the standpoint of judicial administration. We should not adopt a perverse decision just because parties have chosen to file motions under Rule 12(b)(1) instead of Rule 12(b)(6) or Rule 56, or because courts have unquestioningly adopted the diction of "subject matter jurisdiction" without careful examination.

## IV

Finally, if all the rest of these reasons were not enough to compel an "element" reading, a review of the history of the application of the antitrust laws to persons and conduct beyond the borders of the United States also leads

to that result. As the majority notes, the first time the Supreme Court had occasion to consider the question whether the Sherman Act applied to activities outside the United States occurred less than 20 years after the passage of the Act, in *American Banana Co. v. United Fruit Co.*, 213 U.S. 347 (1909). There, writing for the Court, Justice Holmes rejected the plaintiff's argument that the Sherman Act penalized an elaborate arrangement by the defendant that affected banana imports into the United States. At the center of the case was a dispute between Panama and Costa Rica over which country had sovereign authority over a particular banana plantation; plaintiff claimed that the defendant had instigated the border war for purposes of controlling the banana trade. Using language that proved to be far broader than later courts were willing to accept, Justice Holmes wrote that "the general and almost universal rule is that the character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done." *Id.* at 356. Moreover, he wrote, "in case of doubt, [one would be led to] . . . a construction of any statute as intended to be confined in its operation and effect to the territorial limits over which the lawmaker has general and legitimate power." *Id.* at 357. Nothing in this language suggests that the Court thought it was addressing federal court subject matter jurisdiction in the sense of the competence of a court with limited powers to resolve the dispute. This was a topic with which the Justices were certainly familiar, having dismissed an action only one year earlier themselves for failure to satisfy the well-pleaded complaint rule, despite the fact that no one had noticed the problem before the case reached the high court. See *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152 (1908). Instead, it was talking about how broad a statute Congress had enacted, and how much conduct Congress was trying to regulate. It was the legislative branch, in short, which the Court thought had not reached

out to cover an intergovernmental dispute affecting international trade in bananas. There was not a hint that the federal courts had no competence to decide that the Sherman Act did not reach that far.

Between the time *American Banana* was decided and the time when the Second Circuit rendered its *Alcoa* decision, the Court handed down at least two decisions that qualified the strict territorial view of the former case. See *United States v. American Tobacco Co.*, 221 U.S. 106 (1911); *United States v. Sisal Sales Corp.*, 274 U.S. 268 (1927). Both cases also talk in terms of the coverage of the antitrust statutes with respect to the foreign activities and actors. *American Tobacco* upheld the application of the statute to two English corporations, see 221 U.S. at 172, 184-85, and *Sisal Sales* upheld the application of the laws to a Mexican-based conspiracy to control the importation of sisal from Mexico into the United States and its subsequent sale.

The next major decision addressing the extent to which the U.S. antitrust laws reach foreign parties and conduct was *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945) [hereinafter *Alcoa*]. In that case, the court had to decide whether certain foreign parties, who had acted wholly outside the United States, had nonetheless violated the Sherman Act. As the court put it, "[d]id either [agreement] violate § 1 of the Act? . . . [W]e are concerned only with whether Congress chose to attach liability to the conduct outside the United States of persons not in allegiance to it. That being so, the only question open is whether Congress intended to impose the liability . . . ." 148 F.2d at 443. Turning to the field of "conflict of laws" for guidance, the court concluded that "the Act does not cover agreements, even though intended to affect imports or exports, unless its performance is shown actually to have had some effect upon them." *Id.* at 444. In time, this became known as the "intended effects" test,

which in various forms governed until the FTAIA was passed, and arguably still applies in import cases. See *Hartford Fire,* 509 U.S. at 796 ("it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States") and at 797 n.23 (indicating that it was not necessary to address the question whether the FTAIA affected the case).

The *Alcoa* decision was not warmly received in other countries, which as of the mid-1940s did not as a rule have antitrust laws and which resented the apparent effort of the United States to act as the world's competition police officer.[1] See generally Spencer Weber Waller, Antitrust and American Business Abroad, vol. I, ch. 4. This led to an outpouring of scholarly writing on the general question of the way prescriptive jurisdictional lines should be drawn among nations from the perspective of public international law. The fruits of this effort appear today in the American Law Institute's influential Restatement (Third) of the Foreign Relations Law of the United States ("Restatement Third"), Part IV (1987), which addresses the subject of jurisdiction and judgments. The Restatement Third identifies three types of jurisdictional limitations recognized by international law: those on jurisdiction to prescribe ("*i.e.* to make [the state's] law applicable

---

[1]  Today, over 90 countries have competition laws. See, *e.g.*, Diane P. Wood, "International Harmonization of Antitrust Law: The Tortoise or the Hare?" 3 Chicago J. Int'l L. 391, 392 n.6 (2002). Interestingly, the number of disputes over so-called extraterritorial applications of national laws, whether by the United States, the European Union, or others, has dropped dramatically. Discussions today tend to focus on better ways of coordinating these many national-level regimes, and antitrust authorities around the world are eager to cooperate with one another within the confines established by national confidentiality laws.

to the activities, relations, or status of persons, or the interests of persons in things, whether by legislation, by executive act or order, by administrative rule or regulation, or by determination of a court"), those on jurisdiction to adjudicate, and those on jurisdiction to enforce. Restatement Third, § 401. Section 415 of the Restatement Third is devoted specifically to jurisdiction to regulate anti-competitive activities.

The commentary to section 401 addresses exactly the problem now before us: that is, what is the relation between the various heads of jurisdiction identified in the Restatement and the domestic U.S. concept of "subject matter jurisdiction." Comment c reads as follows:

> "Subject matter jurisdiction," in common usage in other contexts, is not used in this Restatement. This term sometimes refers to the constitutional authority of a governmental body, for example the authority of Congress under the United States Constitution to legislate on a subject (principally under Article I, Section 8), or the authority of a State of the United States to legislate within constitutional limitations on State authority (Article I, Section 10). The term is also often used in judicial decisions to describe other limitations on governmental authority, including those involving the reach of United States law, addressed in this Restatement as jurisdiction to prescribe. Jurisdiction to prescribe with respect to transnational activity depends not on a particular link, such as minimum contacts ("use of the mails," or "crossing state lines"), which have been used to define "subject matter jurisdiction" for constitutional purposes, but on a concept of reasonableness based on a number of factors to be considered and evaluated. §§ 402-403.

Thus, the domestic concept of subject matter jurisdiction has no bearing on the question whether the United States

validly prescribed a certain rule of law. Section 415 offers detailed guidance on the scope of prescriptive jurisdiction in cases dealing with anticompetitive activities.[2]

---

[2]  The text and commentary of section 415 is also informative:

§ 415. Jurisdiction To Regulate Anti-Competitive Activities

(1) Any agreement in restraint of United States trade that is made in the United States, and any conduct or agreement in restraint of such trade that is carried out in significant measure in the United States, are subject to the jurisdiction to prescribe of the United States, regardless of the nationality or place of business of the parties to the agreement or of the participants in the conduct.

(2) Any agreement in restraint of United States trade that is made outside of the United States, and any conduct or agreement in restraint of such trade that is carried out predominantly outside of the United States, are subject to the jurisdiction to prescribe of the United States, if a principal purpose of the conduct or agreement is to interfere with the commerce of the United States, and the agreement or conduct has some effect on that commerce.

(3) Other agreements or conduct in restraint of United States trade are subject to the jurisdiction to prescribe of the United States if such agreements or conduct have substantial effect on the commerce of the United States and the exercise of jurisdiction is not unreasonable.

Comment b to this section quotes the FTAIA in full, and goes on to say that "Congress apparently believed that activity whose anti-competitive effects are felt only in foreign states should not be a concern of United States antitrust regulation, but that activities carried out abroad that have 'direct, substantial, and reasonably foreseeable' effect in the United States or on the import trade of the United States (as by limiting imports or fixing the price of imported products) should be subject to the Sherman and FTC Acts."

It is this topic of prescriptive jurisdiction, and how far the U.S. antitrust laws were actually reaching, that was before Congress when it enacted the FTAIA. (While it is true that the House Report on the FTAIA uses the word "jurisdiction" with some regularity, it also speaks repeatedly about whether U.S. antitrust law should be applied to particular transactions. See H.R. Rep. No. 97-686, 97th Cong., 2d Sess. (1982). It is therefore impossible to draw any firm conclusions from that brief document that will assist us in resolving the issue presently before us.) Congress was trying simultaneously to assure U.S. companies that they would not be subject to potentially stricter U.S. antitrust laws when they were conducting business wholly in foreign markets, and to assure foreign countries and their citizens that they would not be swept into a U.S. court to answer under U.S. law for actions that were of no legitimate concern to the United States. Ronald W. Davis, *International Cartel and Monopolization Cases Expose a Gap in Foreign Trade Antitrust Improvements Act*, 15 Sum-Antitrust 53, 53-58 (2001). This much is fairly clear. What has not been clear has been the way in which the FTAIA itself has been handled in the federal courts.

At one level, virtually everyone concedes that federal subject matter jurisdiction exists in cases like United Phosphorus's. The claim certainly arises under a federal law—the Sherman Act—and thus falls within the scope of 28 U.S.C. § 1331 and 28 U.S.C. § 1337. Furthermore, typically no one claims that the claim presented is so frivolous that jurisdiction fails under the principle acknowledged in *Bell v. Hood*, 327 U.S. 678 (1946). Nevertheless, as the majority has accurately noted, defendants who believe that their activities were too "foreign" to be swept under the U.S. antitrust laws have usually attacked the plaintiff's case with a motion under FED. R. CIV. P. 12(b)(1), which covers "lack of jurisdiction over

the subject matter," and sometimes in the alternative with a motion under Rule 12(b)(6), which covers "failure to state a claim upon which relief can be granted."

Although several courts of appeals have decided dismissal motions based on the FTAIA under the rubric of "subject matter jurisdiction," see, *e.g.*, *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 2003 WL 131804 (D.C. Cir., Jan. 17, 2003); *Kruman v. Christie's Int'l PLC*, 284 F.3d 384 (2d Cir. 2002); *Den Norske Stats Oljeselskap AS v. HeereMac Vof,* 241 F.3d 420 (5th Cir. 2001), *cert. denied*, 534 U.S. 1127, 122 S. Ct. 1059 (U.S. Feb. 19, 2002) (00-1842); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998), most have focused on the merits of the FTAIA analysis rather than the precise procedural manner in which it was presented. None of them has given the sustained attention to the "jurisdiction vs. element" inquiry that this court has now done.

Indeed, in the most recent of these decisions, *Empagran,* the court was singularly unconcerned with the distinction between these two approaches. It certainly speaks of a lack of "subject matter jurisdiction" under the federal antitrust laws, 2003 WL 131804 at *1, and the issue reached the court on a motion made under FED. R. CIV. P. 12(b)(1), but both the test the court adopted and its analysis are telling for our purposes. The test it chose to use for FTAIA cases was as follows:

> We hold that where the anticompetitive conduct has the requisite harm on United States commerce, FTAIA permits suits by foreign plaintiffs who are injured solely by that conduct's effect on foreign commerce. The anticompetitive effect itself must violate the Sherman Act and the conduct's harmful effect on United States commerce must give rise to "a claim" by someone, even if not the foreign plaintiff who is before the court.

*Id.* at \*2. In other words, if one is to take the "subject matter jurisdiction" characterization seriously, the court is competent to decide the case only if it concludes (tentatively? conclusively?) that the statute has been violated and someone has standing to sue. With all due respect to my colleagues in the D.C. Circuit, I find such an approach to subject matter to be inconsistent with the Supreme Court's decisions in cases like *Steel Co.* and *Bell v. Hood.* (For the record, I am not necessarily expressing any disagreement with the ultimate result in *Empagran*; my concern is only with this implicit part of the court's rationale.)

Even more troublesome is the court's analysis of subject matter jurisdiction. It begins with the observation that its review is *de novo.* 2003 WL 131804 at \*5. This, of course, would be true if the dismissal were under Rule 12(b)(6) or Rule 56. If it is really under Rule 12(b)(1) and the district court has made findings of fact, then it is not accurate; the legal conclusion would be reviewed *de novo*, but the facts would be reviewed deferentially. In any event, the court continues with the following passage:

> A complaint may be dismissed for lack of subject matter jurisdiction only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Sinclair v. Kleindienst*, 711 F.2d 291, 293 (D.C. Cir. 1983) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)). In our review, this court assumes the truth of the allegations made and construes them favorably to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

2003 WL 131804 at \*5. The problem with this passage is that almost all of it describes not the rule that applies

to motions to dismiss for lack of subject matter jurisdiction, but instead motions to dismiss for failure to state a claim. In *Sinclair,* for example, the district court had dismissed the claim under Rule 12(b)(6), and the passage to which the *Empagran* court referred correctly quotes the governing standard from *Conley*. But the passage in *Conley* has nothing to do with subject matter jurisdiction dismissals. It says instead that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46. While *Scheuer* states that "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a claim, the allegations of the complaint should be construed favorably to the pleader," 416 U.S. at 236, it made this comment in the context of its review of a dismissal based on the Eleventh Amendment, on its way to remanding the case to the lower courts for further fact-finding. It in no way purported to change the rule that when subject matter jurisdiction is contested, the district court itself must hold a hearing to resolve the jurisdictional facts, and that the ultimate decision is for the court, not for a jury. See generally 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1350 at 234-35 (2d ed. 1990). Thus, to the extent that others should follow what the *Empagran* court did, rather than what it said in passing, one should take this as a case acknowledging that a dismissal for failure to meet the standards of the FTAIA is one for failure to state a claim.

The Second Circuit's *Kruman* decision also spoke in terms of a "subject matter jurisdiction" dismissal, see 284 F.3d at 390, and it correctly noted that the district court could "resolve disputed jurisdictional issues of fact through reference to evidence outside of the plead-

ings." *Id.* Nevertheless, as in *Empagran,* the court paid no attention to the issue now before us; it was concerned instead about the type of effect on domestic (or import) commerce the FTAIA requires before conduct could be "regulated by the Sherman Act." *Id.* The same is true of the Fifth Circuit's decision in *Den Norske,* see 241 F.3d at 424-25, and the D.C. Circuit's earlier decision in *Caribbean Broadcasting,* see 148 F.3d at 1085. It is this court, sitting *en banc*, that will be the first one to give a fully considered answer to the question whether the FTAIA strips the federal courts of their competence to hear certain cases that lack sufficient connections to the United States, or if it affirmatively imposes on a plaintiff the burden of proving as an element of its case the existence of those connections.

## V

For all these reasons, I believe that the FTAIA adds an element to an antitrust claim for cases, as the statute puts it, that present "conduct involving trade or commerce (other than import trade or import commerce) with foreign nations." It does not strip the federal courts of subject matter jurisdiction in those cases—a conclusion that would leave the court powerless to make a ruling on the merits of the case, and that would leave the defendants open to suit either in state courts or before other tribunals, judicial or arbitral. The majority's conclusion will also have significant effects on the government's criminal antitrust enforcement program. The Sherman Act, of course, makes it a serious felony to enter into an agreement in restraint of trade. The current Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division, R. Hewitt Pate, recently had the following comments about the Department's international criminal enforcement:

Since late 1996, the Division has prosecuted international cartels affecting over *$10 billion* in U.S. commerce. Well over 90 percent of the total criminal fines we have obtained in this time period were from international cartel cases. . . . The international cartels we have uncovered involved a wide range of industries, including the food and feed additives, graphite electrode, vitamins, construction, fine arts, and textile industries. . . .

Recently, we have concentrated not just on prosecuting corporate cartel members but also on punishing individuals who create and operate the cartels. . . . In the past fiscal year, defendants in Division cases were sentenced to more than 10,000 jail days—a record—with an average sentence of more than 18 months. . . . It is not just U.S. executives who are facing prison sentences, but foreign executives as well. . . .

Turning to our current docket, we now have almost forty grand juries investigating suspected international cartel activity, representing almost half of the Division's criminal investigations.

R. Hewitt Pate, "The DOJ International Antitrust Program—Maintaining Momentum," Speech Before the American Bar Association Section of Antitrust Law, 2003 Forum on International Competition Law, New York City, February 6, 2003, available at http://www.usdoj.gov/atr/public/speeches/200736.pdf (emphasis in original). The government will not want to conduct these investigations in the Seventh Circuit. Defects going to the subject matter of the court can be raised at any time, even if a defendant has pleaded guilty (and guilty pleas play the same important role in antitrust prosecutions as they do in other fields of criminal law). See, *e.g.*, *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781, 1785 (2002) ("*Bain*'s

elastic concept of jurisdiction is not what the term 'jurisdiction' means today, *i.e.* 'the courts' statutory or constitutional *power* to adjudicate the case," [citing *Steel Co.*]. This latter concept of subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."); *United States v. Broce*, 488 U.S. 563, 569 (1989). Indeed, even after direct appeals are over, a defect going to the subject-matter jurisdiction of the court can be raised in a motion under 28 U.S.C. § 2255. From this time forth, therefore, any defendant who believes that the prosecutor has failed to meet the standards of the FTAIA in an antitrust prosecution will be free to raise this point either for the first time on appeal, or in a § 2255 petition. Compare *United States v. Gonzalez*, 311 F.3d 440, 443-44 (1st Cir. 2002) (rejecting a subject-matter-jurisdictional interpretation of a statute permitting drug prosecutions on stateless vessels).

It is important to recall, finally, that there is nothing unique about international antitrust cases. If effect-on-commerce rules are truly jurisdictional, then they are jurisdictional for every statute that contains commerce elements. Countless statutes do, particularly since the Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549 (1995), because that is what justifies congressional action whenever it legislates under its Article I, Section 8 Commerce Clause powers. The majority's approach therefore has the potential of upsetting far more than the small set of cases that present foreign trade antitrust issues.

I respectfully dissent.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—3-10-03